UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:12cr34 (RNC) |
| | | CRIM NO. 3:12cr72 (RNC) |
| v. | : | |
| ROBERT GENTILE | : | May 3, 2013 |

GOVERNMENT'S MEMORANDUM
IN AID OF SENTENCING

The Government respectfully files this memorandum in an effort to assist the Court in fashioning appropriate sentences in the above-captioned matters and to respond to the defendant Robert Gentile's sentencing memorandum ("Def. Memo.") dated April 29, 2013. The defendant is scheduled to be sentenced on May 9, 2013.

I. Background Facts

The presentence investigation report ("PSR") in the instant cases, *Document* 71, sets forth the facts surrounding the defendant's criminal conduct. *See* PSR ¶¶ 6 to 25. As to that underlying criminal conduct, had these cases proceeded to trial, in summary the Government would have proven the following through the testimony of law enforcement witnesses, the testimony of a cooperating witness, numerous consensually recorded conversations with the defendant and his co-conspirator, the testimony of forensic witnesses, and the introduction of seized narcotics, firearms and unregistered silencers:

As to *United States v. Robert V. Gentile and Andrew Parente*, Criminal Docket Number 3:12CR34 (RNC):

1.  Between in or about October, 2011 and November 22, 2011, in the District of Connecticut, the defendant Gentile agreed to engage in conduct with Andrew Parente that

violated the laws of the United States relating to controlled substances.

    2.    Further, the defendant entered into the agreement with Andrew Parente willfully.

    3.    The defendant possessed with intent to distribute a mixture or substance containing a detectable amount of the following controlled substances in the following amounts on the following dates:

    November 22, 2011 - sixty (60) 80 mg tablets of Oxycodone, in a form commonly known as OxyContin;

    October 17, 2011 - fifty-five (55)  4 mg tablets of hydromorphone, in a form commonly known as Dilaudid;

    November 4, 2011 - forty (40) 2 mg tablets of hydromorphone, in a form commonly known as Dilaudid;

    November 21, 2011 - sixty (6) 2 mg tablets of hydromorphone, in a form commonly known as Dilaudid;

    February 10, 2012 - two-hundred (200) 7.5 mg tablets of oxycodone, in a form commonly known as Percocet

    4.    On the dates specified in the preceding paragraph, the defendant Gentile knew he possessed the respective controlled substances and that he intended to distribute and, as to Counts Two through Five, he in fact distributed those respective controlled substances to an individual who was cooperating with federal investigators.

Again, the evidence establishing these facts would have included (a) the testimony of a cooperating witness who recorded numerous conversations with the defendant Gentile and his co-defendant Andrew Parente; (b) the various consensual audio-video recordings themselves; (c) transcripts of the consensual recordings made with the defendants; (e) the testimony of DEA Lab personnel; and (f) the respective controlled substance samples.

    As to *United States v. Robert V. Gentile*, Criminal Docket Number 3:12CR72 (RNC):

    5.    On February 10, 2012, he possessed the three firearms identified in Count One of

the indictment and the ammunition identified in Count Two of the indictment.

      6.      In addition to the three firearms set forth in Count One, he also possessed a .12 gauge Mossberg pistol-grip shotgun and a .22 caliber Colt derringer (both of which were seized by FBI Agents during the February 10, 2012 search of his residence pursuant to a federal search warrant), as well as a .22 caliber rifle without its stock (which was seized by FBI Agents during the May 10, 2012 search of his residence).

      7.      On a date prior to February 10, 2012, the Defendant had been convicted of one or more crimes punishable by imprisonment for a term exceeding one year, that is, felony offenses. The felony offenses included a September 6, 1996 conviction in the Connecticut Superior Court for Larceny in the First Degree, (C.G.S. §§ 53a-122(a)(2) and 53a-119(1)); and a May 20, 1963 conviction in United States District Court for the District of Connecticut for Possession of a Sawed Off Shotgun (in violation of 26 U.S.C. § 5848(1).

      8.      On February 10, 2012, the defendant also possessed the four silencers identified in Count Three of the indictment (each of which was seized by FBI Agents during the execution of a federal search warrant at his residence on February 10, 2012), as well as a fifth silence (which was seized by FBI Agents during the May 10, 2012 search of his residence pursuant to a federal search warrant).

      9.      The defendant acknowledged that each of the silencers meets the definition of a firearm silencer under 26 U.S.C. § 5845(a).

      10.      The defendant knew the features of each of the silencers.

      11.      At the time he possessed the silencers, none of them was registered to him in the National Firearms Registry and Transfer record as required by federal law.

The evidence establishing these facts would have included (a) the testimony of federal agents who searched the defendant's residence in February 2012 and again in May 2012; (b) the various firearms and ammunition seized during those searches, including handguns, a .12 gauge pump action shotgun, a total of five silencers, and hundreds of rounds of ammunition; (c) documents and records establishing the defendant's status as a felon, the interstate transportation of the firearms and charged ammunition, and the failure to register the silencers in the National Firearms Registry; and (d) the testimony of ATF experts on the operability of the various

firearms and the characteristics of the silencers.

While the defendant stipulated to the forgoing facts in the Plea Agreement, he has raised a number of objections to the PSR as set forth in his letters to U.S. Probation Officer Chester dated March 11, 2013, *Document* 71-6, and April 5, 2013, *Document* 71-7.

II. The Presentence Report and Guidelines Calculations

The written Plea Agreement between the parties, a copy of which is incorporated into the Presentence Report, calculates the defendant's adjusted offense level to be 23 and his criminal history category at I, resulting in a Guidelines range of 46 to 57 months of imprisonment and a fine range of $10,000 to $100,000. *See* Plea Agreement at 7. The parties calculated the Guidelines as follows:

> "The defendant's base offense level in the pending drug indictment under U.S.S.G. § 2D1.1(c)(10) is 20. The defendant's base offense level in the pending firearms indictment under U.S.S.G. § 2K2.1(a)(4)(B) is 20. Four (4) levels are added under U.S.S.G. § 2K2.1(b)(1)(B) because 8 or more firearms (as defined under the applicable federal statutes) were involved in the offense. In determining the combined offense level of the pending drug indictment and the pending firearms indictment, two (2) additional level are added under U.S.S.G. § 3D1.4. Accordingly, the defendant's total base offense level is 26.
> Three (3) levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 23.
> Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category I. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.
> A total offense level 23, assuming a Criminal History Category I, would result in a range of 46 to 57 months of imprisonment (sentencing table) and a fine range of $10,000 to $100,000, U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of not less than 3 years and up to life years. U.S.S.G. § 5D1.2(b)."

The PSR sets forth Probation's base offense level calculations at ¶¶ 34 to 54, and, like the

parties, concludes that Gentile's adjusted offense level is 23. Further, the PSR calculates the defendant's Criminal History to be category I. *PSR* ¶¶ 55 63. Accordingly, like the parties, the PSR finds the defendant's Guidelines range to be 46 - 57 months imprisonment, id. at ¶ 85, the period of Supervised Release to be a minimum of 3 years and up to lifetime supervision, *id.* at ¶ 86, and the fine range to be $10,000 - $100,000, *id.* at ¶ 90.

III. Guideline Applications

The defendant requests that the Court impose a sentence below the 46 to 57 month range calculated in Plea Agreement. Recognizing that the PSR has properly calculated the applicable range to be 46 to 57 months, the defendant seeks a non-Guideline sentence "of a noncustodial sentence following time served" based primarily on "his age and infirmity[,] and the high probability that he will not commit any future crimes or pose any danger to the public." *Def. Memo.* at 1.[1] As explained below, the Government respectfully requests that the Court impose a significant prison sentence because the defendant (a) has been involved in criminal activity for virtually his entire adulthood, (b) the criminal conduct at issue involves a context much different from that described by the defense, (c) the defendant's *pre-existing* "age and infirmities" in no way prevented him from engaging in the criminal activities that bring him before the Court for sentencing, nor would they do so if he were to be released and placed on probation, and (d) the defendant's "sincere remorse and regret," *Def. Memo*. at 30, 33, if it exists at all, results from his having been caught rather than from reflection on the conduct itself.

---

[1] In his Sentencing Memorandum, the defendant seeks in the alternative a downward departure in these cases to a term of Probation. *Def. Memo* at 30-33.

IV. Discussion

    A. Determining an Appropriate Sentence Post-Booker

Although imposing sentences within the properly calculated Sentencing Guidelines range are not mandatory, both the Supreme Court and the Second Circuit have stated that they must be considered by the Court along with the other factors listed in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 260-61 (2005); *United States v. Crosby*, 397 F.3d 103, 110 (2d Cir. 2005); *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007)("district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process"). Ultimately, a district court's sentence is reviewed for reasonableness. *Booker*, 543 U.S. at 260-61; *Crosby*, 397 F.3d at 114-15. Reasonableness is a flexible concept and district courts are given latitude in their exercise of discretion to fashion an appropriate sentence, even a non-Guidelines sentence. *See United States v. Jones*, 460 F.3d 191 (2d Cir. 2006).

Importantly, the Second Circuit has instructed district judges to consider the Guidelines "faithfully" when sentencing, *Crosby*, 397 F.3d at 114, and the fact that the Sentencing Guidelines are no longer mandatory does not reduce them to "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *Crosby*, 397 F.3d at 113. In fact, because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46, district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49; *Kimbrough v. United States*, 552 U.S. 85, 107 (2007). Moreover, the Second Circuit has "recognize[d] that in the overwhelming majority of cases, a

Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough*, 552 U.S. at 89 ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

B. <u>The Section 3553 Factors Support a Significant Prison Sentence</u>

Under 18 U.S.C. § 3553(a), the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The statute then provides that "[t]he court, in determining the particular sentence to be imposed, shall consider":

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Sentencing

      Guidelines];

(5)      any pertinent policy statement [issued by the Sentencing Commission];

(6)      the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)      the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The defendant's participation with his co-conspirator in the illegal distribution of prescription drugs, in combination with his possession of silencers, handguns, a loaded pistol-grip shotgun, hundreds of a rounds of ammunition, explosives, a bullet-proof vest, tasers, police scanners, blackjacks, switch-blade knives, and multiple blank social security cards, evidences conduct that *in toto* is extremely serious.  It is respectfully submitted that for the reasons set forth below, this criminal conduct, weighed in view of the factors set forth in § 3553(a) as briefly explained below, supports the imposition of a Guidelines sentence and, more particularly,  one that is consistent with the Guideline range set forth in the PSR prepared by the United States Probation Office, a  range the defendant acknowledges has been properly calculated.  *See* 18 U.S.C. § 3553(a)(4) (Court shall consider the sentence applicable under the Guidelines).

In the Government's view, a sentence within the guideline range of 46 to 57 months or greater (based on the defendant's under-representative criminal history score) is reasonable, and is no greater than necessary to satisfy the purposes of sentencing set forth in § 3553(a).

      C. <u>The Nature and Circumstances of the Offense and the History and Characteristics of the Offender</u>

First, as to the nature and circumstances of the offenses on which the defendant stands convicted, and as discussed above, the unlawful conduct engaged in by Gentile is very serious. The defendant not only illegally distributed prescription drugs on multiple occasions, but that

activity was only representative of what the defendant and his co-defendant/co-conspirator Parente had been doing for an extended period of time.  In his sentencing memorandum, the defense sets out a rather minimalist – and the Government submits distorted --description of his involvement in the distribution of prescription drugs, *Def. Memo* at 10.  In doing so, he completely avoids the defendant's own words concerning his long time and lucrative involvement in such criminal activity.  As the defendant knows from the pretrial discovery in this case, on October 3, 2011, a cooperating witness recorded a conversation involving Gentile, Parente and the cooperating individual.  In that conversation, Andrew Parente and the defendant Gentile discussed selling Oxicontin pills to the cooperator.  During the conversation, Parente described how he and Gentile had a lucrative pill business before [Genovese LCN associate] Tony [Volpe] had undercut them and taken their source of supply.  In referring to that illegal activity, Parente said "[t]here was a lot of money involved in the pill operation," and added that "we [Gentile and Parente] were doing so good."  Gentile indicated that Volpe undercut their operation while he (Gentile) was in the hospital, and stated "Look, I was in the hospital then.  So he [Volpe] figured that was a good time to do it."  When the cooperator asked if he was talking about the pill operation, both Gentile and Parente responded "Yeah," and Parente added ". . . pills.  A lot of money was involved," to which Gentile noted, "[a]bout a million dollars."

    Second, with respect to Gentile's history and characteristics, the defendant is a long time criminal actor and member of La Cosa Nostra.  While the defendant argues in his Sentencing Memorandum that his criminal record is essentially old and of no great significance, in fact, Gentile has been involved in criminal activity over a long period of time.  Separate and apart from the instant charges, his record reflects convictions for Receiving Stolen Goods, *PSR* ¶ 56,

Breach of Peace, *PSR* ¶¶ 57, 59, 61, Carrying a Deadly Weapon in a Motor Vehicle, *PSR* ¶ 59, Possession of Illegal Firearms, *PSR* ¶ 60, and Larceny 1st Degree, *PSR* ¶ 62.  With regard to the instant cases, again, the defendant stands convicted of federal weapons offenses, as well as illegal drug distribution . . . and these crimes were committed by the defendant at a time he was well into his 70's.

      Further, and again as the defendant knows from the pretrial discovery in this case, he has been identified by multiple individuals as a made member of the Philadelphia LCN Family.  The defendant asserts however, that information contained in the PSR relating to Gentile status as a member of the mafia constitute mere "hearsay statements" that "lack the indicia of reliability and specificity that would warrant an upward departure (based on Gentile's criminal history score being underrepresentative)." *Def. Memo*. at 21-22.   The Government respectfully suggests that the defendant's assertions in this regard are disingenuous.

      As the defendant knows, amongst the pretrial discovery materials provided to him regarding his being a soldier in the LCN is a report of interview with Philadelphia LCN capo Robert Luisi, the individual who sponsored Gentile's induction into the mafia.  Luisi's credibility on this matter is supported by not only the fact that he made statements against his own interest, but by a number of revealing details he disclosed about Gentile (and other individuals he sponsored into the mafia and were part of his "crew").  For example, Luisi said Gentile was referred to as "The Cook," a nickname that Gentile has acknowledged using.  Luisi advised that Gentile was close with one Robert Guarente, who also was a member of the LCN and served as Luisi's second in command.  Federal investigators know from independent investigations that

Gentile and Guarente were in fact long time, close friends.  Luisi told investigators that in the past they had committed robberies and possibly other violent crimes together and for a time both Gentile and Guarente had lived with Luisi in Waltham, Massachusetts where they served as his armed bodyguards.  Significantly, Luisi said that Gentile always carried a gun, usually a snubnose .38 caliber revolver, and he also had a .22 caliber derringer.  As the defense knows, and as was stipulated to as part of the Plea Agreement in this case, on February 10, 2012, Agents seized a number of handguns from the defendant's residence, including two short-barreled .38 caliber Smith & Wessen, Model 36 revolvers (both of which were loaded) and a .22 caliber Colt derringer (along with a bag containing more than a dozen rounds of ammunition for the firearm).  In addition, Luisi told investigators that Gentile had given him a silencer for a .45 caliber handgun.  Again, as the defendant knows, and was stipulated to in the Plea Agreement, multiple silencers were seized from his residence in the course of the investigation that led to his convictions on the instant Indictments.  Moreover, Luisi also advised authorities that Gentile had planned to commit an armed robbery of an armored car carrying monies from one of Connecticut's gambling casinos and that he (Luisi) had introduced Gentile to others who might be willing to assist in carrying out such a crime.  This information was independently corroborated by Special Agents of the FBI back in 2000.  *Significantly, all of the foregoing information was provided by Luisi to federal law enforcement authorities back in May of 2000*, that is, long before the investigation leading to the instant Indictments had even been initiated.

      The defendant recites large portions of the PSR regarding the defendant's family, employment history, and the like.  For the most part, the Government is not in a position to

disprove much of what the defendant reported to Probation, and, it assumes, there is truth to at least some of what the defendant reported.  On the other hand, there are several assertions made by the defendant in his Sentencing Memorandum that require at least brief mention.  For example, in his Memorandum, the defendant asserts that he was gainfully employed until he was 65 years old and retired.  *Def. Memo*. at 17.  Yet the PSR reflects that the defendant said he sold his automobile business in 1992 or 1993, at which time he "retired." *See PSR* ¶81.  Given the defendant's date of birth ( July 25, 1936), *PSR* at 2, he would have been either 56 or 57 years old when he purportedly retired – an incredibly young age for most people, even those who have done well financially, to retire.

Similarly, the defendant states in his Memorandum that his household was one in which his children "benefitted from a safe, loving upbringing."  This may very well be true as far as it goes.  However, as the PSR and additional materials reflect, including the transcript attached to the Defendant's Sentencing Memorandum, the defendant appears to have had no problem stealing assets from his deceased father's estate and cheating his siblings out of their portion of inheritance.  ("The defendant was appointed executor of the estate of his father . . . [a]s it turned out, the defendant did not pay out the monies of the estate to the beneficiaries of the estate and the surety company had to pay off on the bond.  As a result, the surety company was required to pay out $73,209.98." *Def. Memo, Exhibit A* at 6.)[2]

---

[2] The transcript of the sentencing proceeding surrounding the defendant's Larceny 1st Degree felony conviction also exhibits a familiar pattern of lying to authorities only to come up with another explanation when the prevarication is discovered. ("Subsequently, a civil action was filed, judgement obtained, and the defendant was brought in for an examination of judgment debtor.  During the course of the examination, [Gentile] was placed under oath.  He first

Finally, in considering the "nature and circumstances of the offense[s]," and the "characteristics of the offender," the Government respectfully suggests that common sense dictates that one conclude the defendant is a dangerous individual. All one needs to do in considering this issue is to ask the simple question, "What even remotely lawful purpose was there for the defendant to be in possession of: multiple handguns, multiple silencers, a loaded pistol-grip shotgun hanging from a door frame inside his residence, a bullet-proof vest, police scanner, handcuffs, tasers, switch blade knives, and explosive devices?" The answer, of course, is there is none and that the defendant not only has not "aged out," *see PSR* at ¶ 101, but he constitutes a continuing danger to others.

    C. Additional Considerations

The Defendant's Medical Condition

The defendant asks that in sentencing him the Court to take into account his medical condition. There is no question but that at 76-years-old, the defendant suffers from a variety of medical issues.[3] *PSR* ¶ 75. That said, there are three overarching considerations that, in the Government's view, suggest that those medical issues should not be used as the basis for either the imposition of a non-Guidelines sentence or a downward departure from the otherwise

---

indicated he had put the money into his auto company, Gem Auto of South Windsor, then changed his response and indicated that he spent the money on personal expenses claiming I did what I had to do. Upon further questioning, he indicated he used the money personally and did not invest in the auto company. He also made other admissions to the administrator that was appointed to succeed him. So basically he lied under oath at the examination of debtor. A warrant was sought, and he was arrested for [L]arceny One.") *Def. Memo.* at 6-7.

  [3] While the defendant has a number of physical ailments, it is to be noted that he does *not* suffer from any mental health issues and is *not* a substance abuser. *PSR* ¶¶ 76, 77.

applicable Guidelines range as calculated by the U.S. Probation Office.  First, the defendant suffered from those very same medical problems at the time he was committing the crimes that bring him before the Court for sentencing.  Second, his medical problems would not preclude him from committing those exact same crimes – and others – again were he merely to be placed on probation.  Third, the Bureau of Prisons ("BOP") is more than capable of attending to and treating the defendant for the medical issues identified in his Memorandum.  Indeed, the defendant has been held in pretrial detention since the time of his arrest and whatever medical needs he has had have been addressed.  Moreover, the BOP has facilities that are more than capable of providing proper medical care to persons with the defendant Gentile's ailments.

Section 5H1.4 (policy statement) of the Guidelines provides that a sentencing Court may departure where appropriate based on a defendant's physical condition.   That section provides in part as follows:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; <u>e.g.</u>, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

Physical impairments, however, are not normally a basis for departure, although Courts of course do have the discretion to depart where a case presents exceptional circumstances.  *Koon v. United States*, 518 U.S. 81, 96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).  The defendant's condition is not extraordinary and can be adequately treated by BOP.  Accordingly, a downward

departure under U.S.S.G. § 5H1.4 is not called for in the instant matters.  *See, e.g., United States v. Latham*, 213 F.3d 627 (Table, text in Westlaw) unpublished disposition, 2000 WL 562426 (2d Cir. May 9, 2000)(affirming district imposition of 41-month sentence at bottom of range and denial of defendant's motion for downward departure under § 5H1.4 due to his suffering from degenerative peripheral neuropathy and claimed loss of the use of his legs where district court explained "I am not going to grant the downward departure motion. I believe that the Bureau of Prisons has facilities that are wholly fit to care for Mr. Latham, and I have seen people in worse conditions properly treated in prisons.").

Probation's Recommendation of Acceptance of Responsibility

      The defendant takes issue with the text of the PSR relating to Acceptance of Responsibility,  wherein he states "the text of the report itself (sic) riddled with inconsistencies and/or self-contradictory assertions every time the author subsequently raises the subject [of acceptance of responsibility)." *Def. Memo.* at 29.  In point of fact, as the defense knows, the 1st draft of the PSR did not include a downward adjustment in the defendant's Base Offense Level for Acceptance of Responsibility based on what the defendant was willing to admit (or perhaps more accurately refused to admit) when first interviewed by Probation.  It was only after a subsequent session with the defendant and his counsel that the defendant made what Probation concluded were sufficient admissions to warrant an adjustment for Acceptance of Responsibility. *See PSR* ¶¶ 27, 101.   Thus, in his Memorandum the defendant points to what really constitutes a minor editing issue rather than overall inconsistencies or self-contradictions in the PSR.

CONCLUSION

Based on the foregoing reasons, the Government respectfully requests that the Court impose a significant prison sentence that is sufficient, but not greater than necessary, to punish to the defendant for the illegal distribution of prescription drugs, the possession of multiple handguns that had traveled in interstate commerce, and the illegal possession of unregistered silencers.  More particularly, the Government requests that the Court impose a sentence within or above the Guidelines range of 46-57 months.  Such a sentence is appropriate based on the complete record before the Court regarding this long time offender who at 76 years of age, and despite having no mental health issues and/or substance abuse problems, continued to engage in serious criminal conduct involving drugs, firearms, silencers, explosives and a wide assortment of criminal paraphernalia that he kept close at hand.

Respectfully submitted,

DAVID B. FEIN
UNITED STATES ATTORNEY

/s/ John H. Durham
JOHN H. DURHAM
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT05087
157 Church Street; 23rd Floor
New Haven, Connecticut  06510
(203) 821-3700

CERTIFICATE OF SERVICE

      This is to certify that on May 3, 2013, a copy of foregoing Government's Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Also, a copy of the foregoing was sent via email to United States Probation Officer Megan Chester.

/s/     John H. Durham  
JOHN H. DURHAM  
ASSISTANT UNITED STATES ATTORNEY